UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-00262 H

JUSTIN SPENCER                                                                                    PLAINTIFF

V.

CSL PLASMA, INC.                                                                                 DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiff claims his termination by Defendant-employer violated KRS § 344.280 and KRS 216B.165, which is actionable under KRS § 446.070. Plaintiff additionally claims Defendant retaliated against him by contesting his unemployment benefits, also in violation of KRS § 344.280. Defendant has moved for summary judgment, and for the reasons that follow, the Court will sustain Defendant's motion.

I.

Plaintiff, Justin Spencer, was hired by Defendant, CSL Plasma, Inc. ("CSL"), a blood plasma collection center, in 2006 in West Virginia. In August of 2007, he relocated to CSL's Louisville Center as an Assistant Manager. There, he worked directly under Scott Robinson, Center Manager, and, above Robinson, Diane Sorenson, Associate Director. The evaluation of Plaintiff's work for the 2007-2008 time period noted problems with communication and maintenance of professionalism in difficult situations. Plaintiff was known to have an aggressive

communication style[1] and to show some lack of respect for established disciplinary procedures.[2] In February 2009, he received a written warning with an improvement plan for the following areas: communication and professionalism, following policies and procedures, and accountability to management.

Plaintiff characterizes himself as a dedicated employee who was perhaps overly concerned about the safety and success of CSL.  During the course of his employment, he made numerous complaints concerning the conditions at the Center.  He sought assistance from his superiors about attendance problems with subordinate employees to no avail.  Spencer also raised several safety concerns with supervisors, mainly concerns about training, weapon control on the premises, a need to implement drug testing of employees, and with regard to specific employees, failure to follow guidelines, improper disposal of biowaste and mislabeling.

Finally, Plaintiff claims that CSL retaliated against him for opposing what he perceived as discriminatory practices that violated the Kentucky Civil Rights Act ("KCRA").  CSL has a policy of requiring its employees to be fluent in English in order to ensure they can read and communicate guidelines and policies with donors.  A fellow Assistant Manager, Melodee Ebel, reported that some Cuban employees had difficulty communicating with donors in English.  Ms. Ebel sent an e-mail to Ms. Ortiz at Human Resources about those concerns and to obtain guidance for addressing the issue. Particularly, Ms. Ebel worried that employees' notable

---

[1] Defendant refers to a stick Plaintiff kept at work that he called a "fix-it-stick" as evidence of his aggressive communication tactics.  It is unclear to the Court how this stick was utilized in the work environment, but understands it could be perceived as aggressive or threatening.

[2] For instance, Plaintiff suspended an employee without first discussing the decision with Human Resources or the Associate Director.  When Plaintiff did communicate with Human Resources, Defendant claims the communication was so ineffective that Human Resources was unable to provide proper guidance to Plaintiff on how to discipline employees.

English deficiencies were resulting in severe miscommunication with donors. In response, Ms. Ortiz responded in an e-mail that "[a]ssessments of English skills should not take place with individuals" absent specific evidence of their performance.  She continued, "[w]e should not just be selecting individuals to assess because of ethnicity.  There needs to be a specific issue or incident."  Plaintiff understood Ms. Ortiz's response to suggest that CSL compile a list only of Cuban employees and any incident in which they were involved; he objected to the notion of such a list in an e-mail on January 9, 2009, feeling that it was a form of racial profiling.

On another occasion in August of 2009, Plaintiff learned that Tamara Gullion, a subordinate employee, claimed to have seen Plaintiff kissing Autumn Smith, another subordinate employee, in the managers' office.  Plaintiff says that he contacted Human Resources and was told to get documentation of the allegations.  Spencer then initiated his own investigation of the allegation by speaking with Gullion in the managers' office.  Another manager, Amanda Dillahunty, was present in the office when Gullion was interviewed.  Plaintiff inquired not only into specific information regarding her allegation, but also asked if her allegation was in retaliation for a recent write-up or questioning about Gullion's drug use.  He claims that Dillahunty informed Gullion that her allegation was serious, and there could be problems if she was not telling the truth.  He told Gullion that the truth would come out.  After the interview, Plaintiff summarized the information he had obtained and forwarded the information along to Human Resources.

Gullion reported the interview both to Human Resources and Robinson, claiming that she feared retaliation from Spencer.  Valerie Ortiz, Human Resources Manager for Louisville, initiated an investigation and ultimately recommended that CSL terminate Plaintiff.  During the

investigation, five employees were interviewed, some of them more than once. Spencer says that Ortiz's notes do not discuss Spencer's allegedly threatening behavior towards Gullion, but rather focuses on the supposed affair with Smith. In any event, Ortiz mistakenly believed that Plaintiff had already received a "final written warning" for improper behavior when she recommended termination. In reality, Plaintiff had only received a "final warning." A "final written warning" is the last step in CSL's progressive discipline procedures before suspension or termination, though management may accelerate or skip steps in the disciplinary process. On September 3, 2009, based on the investigation, Plaintiff was terminated.

As a result of Spencer's termination and CSL's subsequent opposition to Spencer's receipt of unemployment benefits, the Plaintiff asserted three claims against CSL: retaliation in violation of KRS § 216B.165, retaliatory termination in violation of the KCRA, and retaliatory opposition to receipt of unemployment benefits, also in violation of the KCRA.

II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). While the moving party must demonstrate that no genuine issue of material fact exists, in response, the non-moving party must move beyond the pleadings and present evidence in support of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Conclusory

assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir. 2008).

III.

The Court first considers Plaintiff's claim for retaliatory termination pursuant to KRS § 216B.165, the duty-to-report statute within the Licensure and Regulation of Health Facilities and Services Chapter of the Kentucky Revised Statutes. Defendant argues that the statute is inapplicable because CSL does not constitute a "health care facility or service" pursuant to the statute's definition.

Chapter 216B of the Kentucky Revised Statutes broadly governs the licensure and regulation of health facilities and services. Plaintiff asserts a claim pursuant to KRS § 216B.165 which specifically addresses health-facility employees' duty to report and health-facility employers' duty to investigate reports, and prohibits retaliatory acts based upon such reporting. The statute is explicitly binding on "[a]ny agent or employee of a health care facility or service licensed under this chapter." KRS § 216B.165(1). Thankfully Sections 216B.015(12) and (13) actually define a "health care facility" and "health services," as used in the statute:

> [F]or the purposes of this chapter, the following definitions shall apply:
>
> . . . .
>
> (12) "Health facility" means any institution, place, building, agency . . . used, operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventive care. . . .
>
> (13) "Health services" means clinically related services provided within the Commonwealth to two (2) or more persons, including, but not limited to, diagnostic, treatment, or rehabilitative services, and includes alcohol, drug abuse, and mental health services . . . .

5

It seems apparent that Defendant's operations fall outside even a broad reading of these definitions.  A blood collection center, tasked only with collecting donor samples and passing them along, does not provide "medical diagnosis, treatment, nursing, rehabilitative, or preventive care."  *Id.*  Nor does it provide "diagnostic, treatment, or rehabilitative services" as described within the definition of "health services."  *Id.*

In addition to falling outside of the definition of "health facility" or "health service," CDL is not licensed under KRS Chapter 216B.  The statute under which Plaintiff asserts its claim specifies that it binds health care facilities and services "licensed *under this chapter*."  KRS § 216B.165 (emphasis added).  However, CDL is a licensed "blood establishment" under KRS Chapter 214, not a licensed health care facility or service.  Defendant was both surveyed and licensed by the Cabinet for Health and Family Services ("CHFS") in accordance with KRS § 214.452 and § 214.468 which govern blood establishments.

The definition of "blood establishment" in KRS § 214.452 further supports CDL's classification as a blood establishment.  KRS § 214.450(2) defines a "blood establishment" as a "place of business . . . which engages in the collection, preparation, processing, labeling, packaging, and dispensing of blood *to any health care facility, health service, or health care provider*." (Emphasis added).  A plain reading of the statute suggests that while blood establishments may operate in conjunction with health care facilities, health services, and health care providers, they do not necessarily fall within these classifications themselves.

Thus, based on the language of KRS § 216B.165, its definitional provisions §§ 216B.015(12) and (13), and the licensure of Defendant pursuant to KRS §§ 214.452 and 214.468 which govern blood establishments, the Court holds that Defendant does not fall within the

definition of a "health facility" or "health service" licensed under KRS Chapter 216B. Accordingly, Plaintiff's cause of action against Defendant arising under KRS § 216B.165 must fail.

IV.

Plaintiff's remaining claims arise under the KCRA. Plaintiff asserts two separate retaliatory acts in violation of the KCRA; his own termination and Defendant's opposition to his claim for unemployment benefits. Claims under the KCRA are analyzed similarly to claims under Title VII. *Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 435 (6th Cir. 2009). A retaliation claim based on circumstantial evidence is evaluated using the familiar *McDonnell Douglas* burden shifting framework. *Id.* First, a plaintiff must establish that: "(1) he . . . engaged in a protected activity, (2) the employer knew of the exercise of the protected right; (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 720 (6th Cir. 2008). The burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for its actions; plaintiff may then demonstrate that defendant's legitimate, nondiscriminatory reason is pretext. *Hamilton,* 556 F.3d at 435. Here, Defendant claims that Plaintiff did not engage in a protected activity and that he cannot demonstrate a causal connection between the protected activity and the adverse employment action. Defendant also claims a legitimate business reason for its actions. The Court will consider each issue in turn as necessary.

A.

The Court must first determine whether the activities upon which Plaintiff founds his

claims are "protected activities" under Title VII.  This statute protects employees "against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).  The Equal Employment Opportunity Commission ("EEOC") has provided examples of protected activity which include complaining about allegedly unlawful practices or refusing to obey orders believed to be unlawful under Title VII.  *Id.*  Such opposition must be both objectively reasonable and based on a "'good faith belief that the opposed practices [are] unlawful.'"  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001); *Johnson v. Univ. of Cincinnati*, 215 F.3d at 579.  While an employee is not required to make a formal report to the EEOC to gain protection, "a vague charge of discrimination in an internal letter or memorandum is insufficient" to trigger the Act.  *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989).

   The classic Title VII retaliation claim concerns an employee's complaint about a violation against him.  Plaintiff's protected activity assertions are quire different.  In his complaint, Plaintiff points to the following as protected activity: e-mails that he sent to upper-level management airing his grievances concerning: (1) poor employee attendance, (2) his wish to suspend and terminate a number of subordinate employees, (3) the implementation of random drug screening, (4) CDL's policy regarding concealed weapons carried onto the premises by donors, and (5) a procedure suggested by Human Resources that he believed was discriminatory on the basis of ethnicity.  The Court will look at each one.

   Regarding the first four items, Plaintiff's concerns do not amount to protected activity because they fail to identify any unlawful practice under Title VII.  Plaintiff argues that these

8

complaints relate directly to donor safety. While this may be true, these complaints, absent implication of unlawful conduct, are not protected activity. That is, although Plaintiff's complaints relate to safety issues, his grievances identify no violation of law. Consequently, they cannot form the basis for a Title VII retaliation claim.

Plaintiff's last assertion of a protected activity requires a more particular analysis. He claims that his e-mail regarding the investigation of concerns about Cuban employees' English proficiency constitutes protected activity under the KCRA. Plaintiff says that he was opposing a practice that he viewed as discriminatory based on ethnicity. He further asserts that his belief, to be afforded protection under the KCRA, must only be held in good faith.

Unlike the other four complaints, Plaintiff's e-mails regarding an alleged discriminatory practice by CSL do implicate violations of Title VII. However, one's opposition to an alleged discriminatory practice must be objectively reasonable. *Clark Cnty. Sch. Dist.*, 532 U.S. at 270-71. Reading the e-mails objectively reveals that Ortiz sternly warned *against* taking any measure that might in fact be discriminatory. She made it explicitly clear that any identification, confrontation, or targeting of employees based on ethnicity should not be attempted and would not be tolerated. No reasonable person would think Ortiz's suggested course of action was either discriminatory or impermissible under Title VII. The Court fails to understand how Plaintiff could perceive it so.

Therefore, the Court concludes that as a matter of law none of Plaintiff's complaints amount to protected activity under the KCRA. This analysis is sufficient alone to resolve Plaintiff's complaint.

B.

Assuming, *arguendo*, that Plaintiff's complaint regarding discrimination constitutes protected activity, Plaintiff must also establish "a causal connection between the protected activity and the adverse employment action." *Niswander*, 529 F.3d at 720.

Here, the e-mails discussing English proficiency of employees were exchanged approximately eight months before Plaintiff's termination. In the interim, Plaintiff received new responsibilities along with an annual bonus. Nonetheless, Plaintiff states that he was subjected to increased scrutiny during this time, and such scrutiny, along with the eight-month window, is sufficient to establish the causal connection under *Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 436 (6th Cir. 2009). Plaintiff may have a valid argument were it not for the fact that Plaintiff's case is significantly different than *Hamilton.*

In *Hamilton*, the Sixth Circuit held that the combination of "increased scrutiny with the temporal proximity of [Plaintiff's] termination occurring less than three months after his EEOC filing [was] sufficient to establish the causal nexus" for a prima facie case of retaliation. *Id.* at 435-36. Significantly, in *Hamilton* the plaintiff established *increased* scrutiny following his protected activity. *Id.* This, along with close temporal proximity to termination, was sufficient to establish Plaintiff's prima facie case.

Here, several details materially distinguish our case from *Hamilton*. First, Plaintiff has failed to establish that he experienced any increase in scrutiny following his complaints. In fact, the record reveals a constant and longstanding history of behavioral problems on behalf of the Plaintiff. As early as a year prior to termination, Plaintiff received low remarks in his annual evaluation (which addressed his performance dating back to 2007). In addition, both management above Plaintiff and management in Human Resources expressed concern and

disapproval for Plaintiff's unprofessional behavior and remarks on several occasions. The records simply fail to support the suggestion that Plaintiff faced increased scrutiny only after his allegedly protected activity (which occurred eight months before his termination).

Second, a period of eight months passed between the date of Spencer's e-mail and his termination. This is more than twice the length of time that created a presumption of causality in *Hamilton*. Without any showing of increased scrutiny or close temporal proximity, only Plaintiff's assertion of a causal nexus remains, and "[c]onclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir. 2008). Plaintiff cannot meet his burden of showing that his termination related in any way to his complaints.

C.

Even if Plaintiff can show a prima facie case, the employer may "produce evidence of a legitimate, nondiscriminatory reason for its actions." *Hamilton,* 556 F.3d at 435 (quoting *Niswander,* 529 F.3d at 720). If an employer can meet this burden, the employee must demonstrate that the legitimate reason is pretextual. *Niswander,* 529 F.3d at 720.

Defendant says that it terminated Plaintiff after his questioning of Gullion, the employee who claimed to have seen Plaintiff kissing another subordinate employee. Further, Defendant asserts that its investigation determined that the interview was too aggressive and that Plaintiff impermissibly investigated his own alleged misconduct. CSL's Employee Handbook, which Plaintiff admits to having knowledge of and familiarity with, prohibits such conduct.

Because Defendant has identified a legitimate reason for termination, Plaintiff must now establish that this reason was actually a mere pretext. To do so, Plaintiff must show "(1) that the

11

proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that the proffered reason was not sufficient to motivate the discharge." *Gibson v. Finish Line, Inc*., 261 F. Supp. 2d 785, 793 (W.D. Ky. 2003) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000)).

Here, Plaintiff has failed to establish that Defendant's proffered reason for terminating Plaintiff lacks any basis in fact. Plaintiff admits to having investigated Gullion and has failed to offer any evidence that this did not actually motivate his termination. Rather than prove that Defendant's proffered reason lacks any factual basis, Plaintiff alleges his termination was motivated by the several previous complaints he reported. These complaints, however, some of which were made more than a year prior to his termination, do not discount Defendant's proffered reason nor do they prove that the proffered reason did not actually motivate Plaintiff's termination. Finally, Defendant's proffered reason for terminating Spencer appears sufficient and reasonable. Namely, Spencer initiated an investigation into his own alleged misconduct which violated CSL's Employee Handbook.

V.

Having concluded that Defendant had a legitimate reason for terminating Plaintiff, Plaintiff's final claim for retaliation regarding unemployment benefits is vitiated. Plaintiff and Defendant agree that Defendant had a right to contest unemployment benefits if Spencer had been terminated legally. Case law addressing the notion of retaliatory opposition to unemployment benefits is sparse. However, Judge Coffman in the Eastern District of Kentucky has held that "[a]n employer may challenge a former employee's application for unemployment benefits without running afoul of anti-retaliation laws." *Hatton v. United Parcel Serv.,* No. 05-

97-JBC, 2006 WL 1895724, at *3 (E.D. Ky. July 7, 2006). Other courts have reached similar conclusions when confronted with this issue. *See Kowalski v. Kowalski Heat Treating, Co.,* 920 F. Supp. 799, 805 (N.D. Ohio 1996) (discussing that opposition to unemployment benefits was not the type of conduct the Ohio Legislature attempted to prevent or characterize as retaliation since the administrative process accounted for opposition by employers to unemployment benefits). *See also Powell v. Honda of Am.*, No. 06-CV-979, 2008 WL 2872273, at *2 (S.D. Ohio July 22, 2008), (holding that "a former employer's opposition to a request for unemployment benefits is not, as a matter of law, actionable retaliatory misconduct.") The Court agrees with the reasoning of these other district judges. In these circumstances, the legitimate opposition to an unemployment compensation claim cannot be the basis for a retaliation claim.

For the reasons stated, and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that CSL Plasma's motion for summary judgment is SUSTAINED and Plaintiff's complaint is DISMISSED WITH PREJUDICE.

This is a final order.

cc: Counsel of Record